UTAH INTERNATIONAL INC., a corporation, and Nevada Electric Investment Company, a corporation, Plaintiffs,

v.

The DEPARTMENT OF the INTERIOR of the United States; William P. Clark, Secretary of the Interior; the Office of Surface Mining; Richard Harris, Director of the Office of Surface Mining; the Environmental Defense Fund; Friends of the Earth; the Sierra Club; Sylvan Johnson; Leon Lippincott; Caroline Lippincott; Jet Mackelprang; Cynthia Myers; Susan Hittson; Larry Little; Gary A. Kalpakoff; Joan A. Kalpakoff; and East Canyon Irrigation Company.

SIERRA CLUB, a non-profit corporation; Friends of the Earth, a non-profit corporation; Jet Mackelprang; Cynthia Myers; Susan Hittson; and Caroline Lippincott, Plaintiffs,

v.

Donald P. HODEL, et al., Defendants.

Civ. Nos. C–81–0090W, C–81–0172W.

United States District Court,
D. Utah, C.D.

Aug. 29, 1986.

Ronald E. Van Buskirk, David W. Trotter, San Francisco, Cal., F. Alan Fletcher, Salt Lake City, Utah, for Utah Intern. Inc. and Nevada Elec. Inv. Co.

William S. Curtiss, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., Wayne G. Petty, Salt Lake City, Utah, for Sierra Club, Friends of the Earth, Jet Mackelprang, Susan Hittson, Cynthia Myers, and Caroline Lippincott.

Joseph Anderson, Asst. U.S. Atty., Salt Lake City, Utah, Alfred T. Ghiorzi, Dept. of Justice, Land and Natural Resources Div., Washington, D.C., for U.S. Dept. of Interior; James G. Watt, Secretary of the Interior; The Office of Surface Mining; Andrew V. Bailey, Acting Director of the Office of Surface Mining.

David Mastbaum, Boulder, Colo., William J. Lockhart, Wayne McCormack, Salt Lake City, Utah, John Krautkraemer, Berkeley, Cal., William Bennett Turner, Elizabeth D. Laporte, San Francisco, Cal., for The Environmental Defense Fund, Sylvan Johnson, Leon Lippincott, Larry Little, Gary A. Kalpakoff, Joan A. Kalpakoff and East Canyon Irr. Co.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on defendants' motions for attorney's fees. De-

fendants, Environmental Defense Fund ("EDF") and Sierra Club ("Sierra") filed motions with supporting declarations for an award of fees, costs and expenses from the United States. The United States objected. The court heard oral argument on October 25, 1985. David Mastbaum and William J. Lockhart appeared on behalf of defendant EDF. William S. Curtiss and Wayne G. Petty appeared on behalf of defendant Sierra. Alfred T. Ghiorzi appeared on behalf of the United States Department of the Interior and the other federal defendants. Following oral argument, the court took the matter under advisement. After further considering the arguments of counsel, the declarations filed in conjunction with the supporting and opposing memoranda, the memoranda and the relevant authority, the court now renders the following decision and order.

## I. *Background*

On July 25, 1985, the EDF defendants filed a petition for attorney's fees, expert witness fees, costs and expenses in the amount of $500,113.04.[1] On July 31, 1985, the Sierra defendants[2] filed a petition for $189,033.23 in attorney's fees and other expenses.[3] Both EDF and Sierra sought the fee awards from the United States.[4] On October 4, 1985, the United States filed a memorandum opposing the fee applications of EDF and Sierra. The question of EDF's and Sierra's entitlement to collect fees and expenses from the government is the issue we must address.

EDF's and Sierra's involvement in these cases dates back to November 28, 1979 when EDF and Sierra, along with other groups and individuals, filed a petition with the Office of Surface Mining Reclamation and Enforcement ("OSM") and the U.S. Department of the Interior ("Interior") requesting that certain lands abutting Bryce Canyon National Park and Dixie National Forest be designated unsuitable for surface coal mining operations (the "unsuitability petition"). The unsuitability petition was submitted pursuant to section 522 of the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1272, which establishes a process whereby certain lands may be designated by the Secretary of the Interior ("Secretary") as "unsuitable for all or certain types of surface coal mining operations."

The decision on the unsuitability petition was made in December of 1980 when then Secretary of the Interior, Cecil B. Andrus, issued a decision designating an area east and south of Bryce Canyon National Park as unsuitable for surface coal mining operations.[5] In designating the area unsuitable for mining, the Secretary based his decision on a finding that surface coal mining operations would substantially impair public use and enjoyment of Bryce Canyon National Park.[6]

---

1. The EDF defendants, in addition to the EDF itself, are: Sylvan Johnson, Leon Lippincott, Larry Little, Gary A. Kalpakoff, Joan A. Kalpakoff, and East Canyon Irrigation Company.

2. The Sierra Club defendants, in addition to Sierra itself, are Friends of the Earth, Jet Mackelprang, Susan Hittson, Cynthia Myers, and Caroline Lippincott.

3. By the supplemental affidavit of William S. Curtiss dated November 13, 1985, Sierra argued that the $189,033.23 award requested in the original petition should be augmented by an additional $36,224.88. The additional fees and costs sought by Sierra arose out of Sierra's efforts to prosecute the fee petition which is the subject of this opinion. Sierra, therefore requests a total award of fees and expenses totaling $225,258.11.

4. "United States" and the "government" are used to refer collectively to the federal defendants in these actions. The federal defendants are The Department of the Interior of the United States; William P. Clark, Secretary of the Interior; The Office of Surface Mining; and Richard Harris, Director of the Office of Surface Mining.

5. The area actually designated unsuitable for mining by Secretary Andrus constituted only a portion of the area covered by the unsuitability petition. The United States asserts that only 10% of the land covered by the petition was ultimately declared unsuitable while EDF and Sierra claim that 50% of the land covered by the petition was declared unsuitable for mining by Secretary Andrus.

6. In pertinent part, the Secretary stated:
   ... [m]ining in the designated areas would cause significant cumulative impacts on Bryce Canyon National Park by reducing visibility, by creating dust plumes and large disturbed

Three separate lawsuits challenging the Secretary's decision were filed, and counterclaims and cross-claims were brought by some of the parties. Two of these lawsuits concern us here.[7]

In *Utah International, Inc. and Nevada Electric Investment Company v. Department of the Interior, et al.,* Civil Action No. C–81–0090W, Utah International ("UII") and Nevada Electric, which had planned to mine the designated area, sought a permanent injunction enjoining Interior from implementing or enforcing the designation decision. They also sought an order from the court declaring the decision arbitrary, capricious, inconsistent with law, in excess of jurisdiction and unsupported by substantial evidence in the record. EDF, Sierra, and the United States were named defendants in this suit.

EDF filed an Answer, Counterclaims and Cross-Claims. The Answer denied the germane allegations of the complaint and alleged that, after the designation petition was filed, UII made several *ex parte* communications with Interior officials which estopped UII from challenging the designation. EDF advanced counterclaims against the plaintiffs and cross-claims against the United States. The cross-claims generally objected to the Secretary's refusal to include in the unsuitability designation the entire area described in the original petition. Sierra also filed an Answer, Cross-claims and Counterclaims. Sierra's cross-claims against the United States likewise alleged that the Secretary erred in refusing to designate additional portions of the petition area.

On March 13, 1981, Sierra filed *Sierra Club v. Watt,* Civil Action No. C–81–0172W, which repeated the allegations of Sierra's cross-claims against the United States in the *Utah International* action. Sierra sought the following relief:

> areas which would be visible for long periods of time from the park, and by generating mechanical activity and blasting that would be audible from the park, thereby adversely affecting the value for which the park was

1. That the Court declare the portion of the Secretary's decision, which failed to designate the entire petition area unsuitable for surface coal mining operations, to be:

a. Arbitrary and capricious, in violation of Section 526(a) of the Surface Mining Control and Reclamation Act;

b. Contrary to the requirements of Section 522(a) of the Surface Mining Control and Reclamation Act;

c. In violation of the Secretary's statutory trust obligations to preserve and protect Bryce Canyon National Park and the public enjoyment thereof; and

d. Contrary to Section 102(2) of the National Environmental Policy Act ("NEPA").

2. That the Court issue an order vacating such portion of the Secretary's decision.

3. That the Court issue an injunction against the Federal defendants;

a. Requiring that a supplement to the final environmental statement or other interdisciplinary, integrated analysis be prepared which fully meets the requirements of NEPA;

b. Restraining them from implementing any portion of the Secretary's decision insofar as it failed to designate any portion of the rejected area as unsuitable for surface coal mining operations; and

c. Requiring them to issue an amended decision on the petition as it concerns the rejected area.

In September of 1981, more than six months after the initiation of judicial review, the United States moved this court for an order remanding the entire Andrus' unsuitability designation for reconsideration by then Secretary of the Interior, James Watt. UII and Nevada Electric supported the remand request. EDF and Sierra opposed it. On January 27, 1982, this

> established and, thus, the experience of the park's visitors; ...

7. The third suit, filed by the State of Utah, was later settled.

court denied the motion to remand in a one-page summary order.

Following this court's denial of the remand motion, the parties filed motions and cross-motions for summary judgment. On December 28, 1982, this court issued a decision upholding the unsuitability designation against various procedural and substantive challenges made by UII and the State of Utah.[8]

Following the summary judgment decision, the parties engaged in negotiations which ultimately led to the voluntary dismissal of most of their claims. EDF, however, retained its claim concerning the effects of surface coal mining operations on the water resources of the petition and adjacent areas (the "hydrology claim").

In February of 1985, a stipulated agreement was reached among EDF, the United States, UII and the other petitioners resolving EDF's hydrology claim. This stipulation was approved by the court on February 12, 1985. *See* note 33, *supra.* On April 29, 1985, UII's claim that the designation decision constituted an unconstitutional taking was dismissed in accordance with UII's earlier representations. The court entered final judgment in the cases on June 26, 1985. *See* note 11, *supra.*

EDF and Sierra assert their claims for fees and costs under two alternate theories. They first allege that they are entitled to an award under Section 525(e) of SMCRA, 30 U.S.C. § 1275(e). They specifically seek attorney and expert witness fees, costs and expenses both for their participation in the administrative proceedings leading to the unsuitability designa-tion and for their participation in the subsequent judicial proceedings.[9]

In the alternative, EDF and Sierra argue that, should the court deny their petitions for fees under SMCRA, they are entitled to an award of fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, for the time they spent in opposing the United States' motion to remand the designation to Secretary Watt for reconsideration.

The United States opposes the fee petitions. It maintains that EDF and Sierra are entitled to an award under neither statute. The government first asserts that the motions should be denied because they are untimely. It further asserts that the petitioners are entitled to fees under neither SMCRA nor the EAJA because petitioners did not "prevail" on their substantive claims. It also asserts that, should the court conclude the parties have "prevailed" to the extent necessary to justify an award under SMCRA, the Secretary, and not this court must determine any award for fees arising from the administrative proceedings. Finally, the United States argues that the fee provisions of SMCRA apply only to proceedings relating to the enforcement scheme of that Act and that EDF and Sierra therefore are not entitled to any fees arising out of the unsuitability designation proceedings.

## II. *Timeliness*

■ The initial question we must address is whether these petitions for fees were timely under the local rules of this court.[10] The government's argument is based on Local Rule 14(a) which provides in pertinent part:

---

8. *Utah International, Inc. v. Department of the Interior of the United States,* 553 F.Supp. 872 (D.Utah 1982).

9. While EDF seeks an award for the fees incurred in connection with all of its claims in the judicial proceedings, Sierra seeks fees only for work done in connection with Sierra's role as a defendant. Fees for the work done in conjunction with Sierra's affirmative claims have been excluded from Sierra's petition, presumably because Sierra felt it did not achieve the requisite degree of success on those claims to qualify for a fee award.

10. The United States also asserts that the petitions were untimely under the EAJA, 28 U.S.C. § 2412(d)(1)(B), which requires a party seeking an award of fees and expenses under that act to submit an application to the court within 30 days of final judgment. We need not address the timeliness claim as it relates to the EAJA inasmuch as the fees awarded in these actions are awarded pursuant to SMCRA rather than the EAJA. *See* section V, *supra.*

(a) Motion to Tax Costs. Within twenty (20) days after final judgment, the party recovering costs shall file with the clerk a motion to tax costs.

Civ.R. Practice, U.S. Dist.Ct., Dist. of Utah, 14(a). The government argues that even if final judgment in these cases was not entered until June 26, 1985, as petitioners contend, the applications for fees were untimely because they were not filed until after July 16, 1985—20 days after the entry of final judgment.[11]

We find the government's argument to be without merit. The term "costs," as used in Local Rule 14(a) does not include attorney's fees. The language of Rule 14(a) presupposes that a party has already recovered costs as part of the judgment on the merits of the action. Such is usually not the case with attorney's fees. Furthermore, under Rule 14(a), a motion to tax costs is filed with the clerk of the court. Rule 14, however, contemplates only those costs that can be taxed routinely by a clerk. Thus, we hold that Local Rule 14(a) only contemplates costs that are normally disposed of by a judgment.

In urging the opposite conclusion, the United States relies on *Marek v. Chesney,* —— U.S. ——, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985). Under *Marek,* attorney's fees are considered part of costs when the statute in question refers to attorney's fees and other expenses as "costs." The government maintains that *Marek* controls the characterization of fees and costs under Section 525(e) of SMCRA.

We disagree. *Marek* is not controlling here for two reasons. First, *Marek* applies only to fee statutes in which fees are defined as part of costs. Second, the reasoning of *Marek* is inapplicable to rules such as Local Rule 14 which leave no room for

the court's discretion in arriving at a fee award.

In *Marek,* the Supreme Court held that, for purposes of Rule 68 of the Federal Rules of Civil Procedure, the term "costs" embraces attorney's fees *only* "where the underlying statute defines 'costs' to include attorneys' fees." —— U.S. at ——, 105 S.Ct. at 3016, 87 L.Ed.2d at 9. In *Marek,* the fee application was made pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, which allows a prevailing party "a reasonable attorney's fee *as part of the costs.*" 42 U.S.C. § 1988 (emphasis added). Section 525(e) of SMCRA, unlike 42 U.S.C. § 1988, does not define "costs" to include attorney's fees. Rather, Section 525(e) authorizes an award of "all costs and expenses (including attorney fees)." 30 U.S.C. § 1275(e). Not only does Section 525(e) refer to expenses separately from "costs," the reference to "attorney's fees" is placed adjacent to the term "expenses" rather than the term "costs." According to the statutory construction doctrine of last antecedent, such a placement indicates a legislative intention that "attorney's fees" be construed as "expenses," rather than as "costs." *See Azure v. Morton,* 514 F.2d 897, 900 (9th Cir.1975). Even for purposes of Fed.R.Civ.P. 68, therefore, "costs" does not necessarily include attorney's fees in an action brought pursuant to Section 525(e) of SMCRA.

It should be recalled that the majority opinion in *Marek* is grounded on an interpretation of Rule 68. The government's attempt to extend the application of the *Marek* holding beyond that rule is misplaced and is supported by neither the terms nor the analysis of the Supreme Court's decision in *Marek.*[12] Under Local

11. While EDF and Sierra contend that final judgment was entered in these cases on June 26, 1985, the government contends it was actually entered earlier. It maintains that, following a hearing held on February 13, 1985, the court, pursuant to stipulation, dismissed all of EDF's and Sierra's claims. The only claim remaining was UII's fifth amendment taking claim which was disposed of by the court on April 29, 1985. The government reasons that, because nothing

further remained to be done in these cases with respect to the merits of any claim as of April 29, 1985, that date should be considered the date of final judgment for purposes of determining the timeliness of petitioner's fee applications.

12. Other courts have declined to hold that attorneys' fees are "costs" for purposes of the 14–day time limit for filing a bill of costs provided in Rule 39, Federal Rules of Appellate Procedure.

Rule 14, "costs" are taxed by the clerk of the court as a routine matter. Under Section 525(e), however, attorney fees "may be assessed against either party as *the court* ... deems proper." (Emphasis added.) The caselaw interpreting similar provisions uniformly stresses the great degree of discretion the trial judge has in awarding attorney fees. *See e.g., Hernandez v. George,* 793 F.2d 264 (10th Cir.1986) (district court has wide degree of discretion in assessing attorney fees under 42 U.S.C. § 1988). The emphasis placed on the discretion of the trial judge in awarding attorney fees convinces us that motions for awards of such fees must be decided by the trial judge. It is axiomatic, therefore, that they are not part of "costs" that can be taxed by the clerk of the court under Local Rule 14.

III. *Eligibility for An Award Under SMCRA*

■ Having decided that petitioners' motions for fee awards are timely, we turn to the merits of their claims for fees under Section 525(e) of SMCRA which provides:

Whenever an order is issued under this section, or as a result of any administrative proceeding under this chapter, at the request of any person, a sum equal to the aggregate amount of all costs and expenses (including attorney fees) as determined by the Secretary to have been reasonably incurred by such person for or in connection with his participation in such proceedings, including any judicial review of agency actions, may be assessed against either party as the court,

resulting from judicial review or the Secretary, resulting from administrative proceedings, deems proper.

30 U.S.C. § 1275(e).

EDF and Sierra seek awards under Section 525(e) for attorney and expert witness fees, costs, and expenses incurred in their participation in the administrative proceedings resulting in the Secretary's unsuitability designation and in conjunction with their participation in these judicial proceedings.

Although an award of fees under Section 525(e) lies in the discretion of the trial court, that discretion is not without limit. Courts have outlined the standards a party must meet in order to qualify for an award of fees under statutes such as Section 525(e).

A. *Some Success on the Merits*

The one limitation imposed by the language of Section 525(e) on the discretion of the trial judge in awarding fees is that such awards must be "proper." Guidance as to what constitutes a "proper" award is contained in *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983). In *Ruckelshaus,* the Supreme Court addressed the issue of when it is "appropriate" to award attorney's fees under a fee statute similar to Section 525(e). We hold that *Ruckelshaus* is controlling here in determining when an award of fees is "proper" under SMCRA.

The statute involved in *Ruckelshaus* was § 307(f) of the Clean Air Act. Section 307(f) provides:

In *Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 672 F.2d 42 (D.C.Cir. 1982), the Court of Appeals held that a motion for attorneys' fees under the Toxic Substances Control Act ("TSCA") was not controlled by Rule 39, stating:

Rule 39 covers only 'costs,' not attorneys' fees. We are unwilling to apply the 14-day limitations period from Rule 39 in connection with a statutory fee provision. There is no specific limitations period for the submission of attorneys' fees claims under section 19(d) of TSCA. The statute simply provides that fees may be awarded 'if the court determines that such an award is appropriate.' This standard gives a

court discretion to consider the reasonableness of attorneys' fee claims and, if 'appropriate' (considering traditional equitable principles), to reject claims as untimely filed.

672 F.2d 61. *Accord Northern Plains Resource Council v. Environmental Protection Agency,* 670 F.2d 847, 848 n. 1 (9th Cir.1982), *vacated on other grounds,* 464 U.S. 806, 104 S.Ct. 54, 78 L.Ed.2d 73 (1983). Section 525(e), like TSCA, contains no time limit for fee applications, and the principles above are equally applicable here. In this instance, the United States does not, and cannot, claim any equitable ground upon which the application is untimely.

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is *appropriate.* (emphasis added).

42 U.S.C. § 7607. The Court in *Ruckelshaus* noted that "appropriate" means "specially suitable: fit, *proper." Ruckelshaus,* 463 U.S. at 683, 103 S.Ct. at 3276 (emphasis added). Section 525(e) of SMCRA provides for an award of fees when such award is deemed "proper" by the court or the Secretary. Because "proper" and "appropriate" are synonymous, we conclude that the *Ruckelshaus* standard regarding fee awards is controlling here.

In *Ruckelshaus,* the Court concluded that an award of attorney fees is not "appropriate" absent "some degree of success on the merits by the claimants." *Id.* at 694, 103 S.Ct. at 3282. The starting point for the Court's reasoning was the "American Rule" under which each party is responsible for its own fees and even the prevailing litigant is ordinarily not entitled to collect attorney's fees from the loser. The Court noted the consistent practice of following the American Rule in the United States and concluded that it should not be abandoned absent a clear showing that Congress intended such a result. Also relevant to the Court's holding was the fact that Section 307(f) affects fee awards against the United States as well as against private parties. Because authorization of an award of fees against the United States is a waiver of sovereign immunity, any such authorization must be strictly construed in favor of the United States. *Id.* at 685, 103 S.Ct. at 3277. Because neither the statutory language nor the legislative history clearly indicated congressional intent to abandon longstanding and generally accepted principles of fee shifting, the court held that a party must achieve some success on the merits of its claims in order to be eligible for a fee award.

These same considerations are applicable to interpretation of Section 525(e). We conclude that in authorizing fee awards when "proper" under SMCRA, Congress did not mean to wholly abandon historic principles of fee shifting. We therefore hold that in order to be eligible for an award of fees pursuant to Section 525(e), the petitioners must have achieved at least some success on the merits.

Application of this standard to the proceedings at issue presents a myriad of difficult questions. First, what constitutes "some success?" Second, assuming a showing of some success, are petitioners entitled to compensation for the work they did in conjunction with all of their claims or only for the work done in conjunction with those claims on which they were successful?

Guidance as to the meaning of the phrase "some degree of success" can be gleaned from the Court's opinion in *Ruckelshaus* where it compared the "some degree of success" standard with the more stringent "prevailing party" standard.[13] The Court reasoned:

> Section 307(f) was meant to expand the class of parties eligible for fee awards from prevailing parties to *partially prevailing* parties—parties achieving *some success,* even if not major success. [footnote omitted]. Put differently, ... Congress intended to eliminate both the restrictive readings of "prevailing party" adopted in some of the cases ... and the necessity for case-by-case scrutiny by federal courts into whether plaintiffs prevailed "essentially" on "central issues."

*Id.* at 688, 103 S.Ct. at 3279. The Court was careful to note, however, that "trivial success on the merits, or purely procedural victories, would not justify an award of fees under statutes setting out the 'when appropriate' standard." *Id.* at 688, n. 9, 103 S.Ct. at 3279, n. 9.

---

**13.** A number of federal fee statutes restrict awards of fees to "prevailing parties." *See e.g.,*

The Civil Rights Act, 42 U.S.C. § 1988.

## B. *Alignment with the Government*

Another issue presented by these fee petitions under SMCRA is whether it is "proper" to assess fees against the government and award them to parties aligned with the government.

At the outset, we find it curious that the petitioners are seeking fees from the United States, a co-defendant, and not from opposing parties, UII and Nevada Electric. Nowhere does Section 525(e) specify that the United States should bear any special responsibility for fees. Rather, it simply states that costs and expenses (including reasonable attorney fees) "may be assessed against *either* party" as the court or Secretary deems proper. As noted above, an award of fees is not proper unless the party seeking the award achieved at least some success on the merits. This case presents the related question of whether it is proper to assess fees against one successful party in order to award them to another successful party.

Petitioners rely on two cases from the Court of Appeals for the District of Columbia Circuit in support of their contention that it is proper to assess fees against the government in order to award them to a party aligned with the government. We find the logic and holding of neither compelling. In the first case, the court explicitly declined to reach the issue and in the second, the court's discussion of the issue was mere dicta.

The first of these cases is *Alabama Power Company v. Gorsuch*, 672 F.2d 1 (D.C. Cir.1982). *Gorsuch* involved a request for fees from the Environmental Protection Agency ("EPA") by a group of organizations that had intervened in the EPA's behalf. The EPA opposed the petition on the ground that the petitioners' efforts had been duplicative of its own efforts. In responding to the EPA, the court stated:

> If ever an intervenor can recover attorneys' fees from a party on whose side it participated—*a question we do not here reach*—the justification would have to be a clear showing of some unique contribution of the intervenor to the strength of

that party's legal position. (emphasis added.)

*Id.* at 4.

The court did address the issue later in dicta in the second of the cases relied on by petitioners, *Donnell v. United States*, 682 F.2d 240 (D.C.Cir.1982), *cert. denied*, 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983). *Donnell* was brought under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (1976), in which intervenors on behalf of defendant United States sought an award of fees from the plaintiff. The plaintiff objected to the award on the ground that the government needed no aid in defending the suit and that the intervenors' participation had been subordinate and unnecessary.

The court first noted that the legislative history of the Voting Rights Act was silent on the issue as to whether intervenors aligned with the government were eligible for fee awards from parties other than the government. It pointed out, however, that the legislative history did stress the importance of the fee provision as a mechanism for enabling private citizens to act as "private attorneys general" in bringing suits to vindicate the civil rights laws. The court reasoned that the private attorney general rationale is far less compelling when the actual Attorney General participates in the case. It reasoned that, "in considering an intervenor's request for attorneys' fees, the district court is obligated to examine the particular role played by the intervenor in the lawsuit." *Id.* at 247. It concluded:

> If a lawsuit is successful, but the intervenor contributed little or nothing of substance in producing that outcome, then fees should not be awarded.

\* \* \* \* \* \*

Where Congress has charged a governmental entity to enforce a statutory provision, and the entity successfully does so, an intervenor should be awarded attorneys' fees only if it contributed substantially to the success of the litigation. This inquiry primarily entails determining whether the governmental litigant

adequately represented the intervenors' interests by diligently defending the suit. It also entails considering both whether the intervenors proposed different theories and arguments for the court's consideration and whether the work it performed was of important value to the court.

*Id.* at 248–49.

Thus, in *Donnell,* the court did address whether parties aligned with the government were eligible for fee awards. However, that discussion arose in the context of intervenors seeking an award from an unsuccessful party rather than from the governmental entity with which they were aligned. The two cases relied on by EDF and Sierra for the proposition that one prevailing party may seek a fee award from another prevailing party with which it is aligned contain no such holding. The Court in *Alabama Power,* explicitly declined to reach the issue [14] and *Donnell,* while citing *Alabama Power,* did not actually involve a situation where intervenors on the side of the government sought fees from the government.

All of the cases we have located awarding fees to intervenors aligned with the government are cases in which the award was sought from the losing party and not from the governmental party aligned with the intervenors. *See e.g., Seattle School District No. 1 v. State of Washington,* 633 F.2d 1338 (9th Cir.1980), *aff'd,* 458 U.S.

457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (intervening appellees as well as appellee were entitled to fee award from appellants); *Baker v. City of Detroit,* 504 F.Supp. 841 (E.D.Mich.1980), *aff'd,* 704 F.2d 878 (6th Cir.1983), *on reh'g,* 712 F.2d 222 (6th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984) (intervening defendants were entitled to fee award from plaintiff pursuant to 42 U.S.C. § 1988); *Wade v. Mississippi Cooperative Extension Service,* 378 F.Supp. 1251 (N.D.Miss.1974), *vacated,* 528 F.2d 508 (5th Cir.1976) (plaintiffs aligned with the government were entitled to an award of attorney fees from the defendants.) The petitioners have not cited a single case in which one prevailing party recovered fees from another prevailing party.[15] We believe such an award would not be proper within the meaning of Section 525(e).

Allowing a party that had achieved some success on the merits to collect fees from another party also achieving some success on the merits would result in circuitous litigation. Assume, for example, a situation where party X brings suit against parties Y and Z. Parties Y and Z both achieve some degree of success on the merits as against party X. It seems only logical that parties Y and Z should bring any claims for fees against party X. Assuming that both Y and Z made significant contributions in achieving the success, Y would be no more entitled to collect from Z than Z would from Y.[16] It is clear in such a case that X

---

**14.** Had the court reached the issue, we are unable to see how it could have justified an award of fees against the prevailing party. The statute authorizing a fee award in *Alabama Power* was Section 307(f) of the Clean Air Act which provides:

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

42 U.S.C. § 7607(f). Because attorney's fees under the Clean Air Act are awarded as part of costs, it is axiomatic that fees awarded under that statute are to be assessed against the party responsible for costs—the losing party.

**15.** The only case we have located in which an award was sought from the government by those aligned with the government is *Natural*

*Resources Defense v. EPA,* 595 F.Supp. 65 (D.D.C.1984), a case brought under the Water Pollution Control Act. In that case, the court stated:

This court can find no rationale to justify an award of fees against the government for work performed by [the fee applicant] against intervenors. The government should not be held liable for fees incurred in a dispute between private parties. In fact, EPA worked alongside [the fee applicant] and prevailed in its opposition to intervenors' motions. This court finds that under these circumstances it is not "appropriate" to award fees against EPA.

*Id.* at 70 n. 1.

**16.** Sierra practically implied as much in its reply memorandum when it argued:

As defendants, the Sierra Club Defendants have prevailed to exactly the same degree as

should be responsible for any fees awarded.[17]

Such a result is consistent with the rationale behind both the "prevailing party" requirement, common in many federal fee statutes, and the *Ruckelshaus* requirement that one must achieve some success on the merits before he is eligible for a fee award. One of the notions behind those requirements is that it would be unjust to require that a successful party pay its adversary's fees. Similarly, ordinary conceptions of justice reject the idea that a successful party be required to pay the costs of another successful party aligned with it while an unsuccessful party pays nothing. The whole notion behind the "some degree of success" and "prevailing party" requirements is that the losing party pay the fees.

Furthermore, allowing one successful party to recover from another successful party may encourage duplicative efforts by lawyers in an attempt to recover fees. Parties not actually necessary to the litigation or to the enforcement scheme of SMCRA may participate on the side of the government in hopes of collecting from the government. However, as the Court of Appeals for the District of Columbia Circuit indicated in *Donnell*, 682 F.2d 240, the private attorney general rationale for allowing an award of fees loses much of its appeal when the government is also a party. *Id.* at 247.

Finally, the language of the statute, Section 525(e), compels the conclusion that successful parties need not pay attorney's fees for other successful parties. Section 525(e)

provides for an award of "all costs and expenses (including attorney fees)." Costs and expenses are always assessed against the losing party and added to the amount of judgment.[18] *See* Fed.R.Civ.P. 54. Fees should also therefore be assessed against the losing party.

It could be argued that the phrase "may be assessed against either party" in Section 525(e) was intended to allow fee assessments against any party—regardless of whether or not such party was successful. We must reject this interpretation because it is the exact interpretation rejected by the Supreme Court in *Ruckelshaus*. We believe that the correct interpretation of the phrase "may be assessed against either party" is that a party achieving some success on the merits may recover regardless of whether that party acted as plaintiff or defendant.[19]

We therefore hold that it would not be proper to award fees to petitioners and assess them against the government for those phases of the litigation during which petitioners were aligned with the government.

## C. *The Administrative Proceedings*

■ In addition to their claim for all fees and expenses incurred in connection with the proceedings in this court, petitioners seek an award for all fees and expenses incurred in connection with the administrative proceedings leading to the unsuitability designation. Because EDF and Sierra were not "aligned with the government"

---

the Federal Defendants, who themselves assert a claim of victory over UII. Sierra Club Defendants' Reply Memorandum in Support of Application for Award of Attorneys' Fees, p. 16. One is left wondering why the United States, on the basis of Sierra's statement, is not entitled to an award of fees from Sierra "to exactly the same degree" as Sierra is entitled to an award from the United States.

17. Even in a case where one of the two aligned parties played a more significant role in achieving the success than the other, it would be more appropriate to assess fees against the losing party and award them only to the party actually contributing to the successful result than to allow the relatively contributing successful party

to recover fees from the relatively non-contributing successful party and then require the non-contributing successful party to seek indemnification from the losing party.

18. *See* note 14, *supra.*

19. In several federal statutes providing for fee awards, different standards apply to recovering fee awards from plaintiffs than from defendants. In order to recover an award from a plaintiff under these statutes, the suit must have been wholly without merit. *See e.g., Ruckelshaus*, 463 U.S. at 692 n. 13, 103 S.Ct. at 3281 n. 13.

during the administrative proceedings on the unsuitability petition, these petitions for fees present a question of first impression as to the type of proceedings for which fees are properly awarded pursuant to Section 525(e) of SMCRA.

Petitioners contend that the plain language of Section 525(e) does not restrict the type of proceedings for which fee awards are authorized and contend that they are entitled to an award from the government for the time spent in the administrative proceedings. The government, however, maintains that Section 525(e) does not apply to unsuitability proceedings pursuant to Section 522 of SMCRA. They assert, therefore, that the petitioners are not entitled to any fees for work done in conjunction with the unsuitability petition at the administrative level. In support of this contention, the government relies on the legislative history of SMCRA, the interpretation placed on SMCRA by Interior and the general principles applicable to interpretation of statutory fee shifting provisions.

Our starting point is necessarily the statutory language itself. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). The relevant language reads:

> Whenever an order is issued under this section, or *as a result of any administrative proceeding under this chapter* ... a sum equal to the aggregate amount of all costs and expenses ... may be assessed against *either party* .... (emphasis added.)

30 U.S.C. § 1275(e).

The issue presented is whether the term "any administrative proceeding" encompasses proceedings held in conjunction with petitions for unsuitability designations. While the phrase "any administrative proceeding" would seem to encompass *all* administrative proceedings, ascertainment of the meaning apparent on the face of a statute need not end the inquiry. The circumstances surrounding the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect. *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). The Supreme Court has stated:

> It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.... [F]requently words of general meaning are broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words makes it unreasonable to believe that the legislator intended to include the particular act.

*Holy Trinity Church v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

To ascribe to the literal words of Section 525(e) the meaning that the petitioners favor—that one is eligible for an award of fees incurred in connection with *all* administrative proceedings—would subject participating parties to attorney fees in every SMCRA related administrative proceeding before the Office of Surface Mining or the Secretary of the Interior.[20] Such an interpretation is inconsistent with the other terms of Section 525(e) which appear designed to govern fee awards only in adversarial type enforcement proceedings.

The problems posed by an application of Section 525(e) to non-enforcement, non-adversarial proceedings convinces us that Section 525(e) was not intended to provide for awards in such proceedings. For discussion sake, assume application of Section 525(e) to a rulemaking proceeding in which a number of various groups all proffer different views to the Secretary. Upon

---

**20.** The list of potential proceedings includes 1) rulemaking on the interim program; 2) rulemaking on the permanent program; 3) revisions to rules; 4) petitions for rulemaking; 5) designation proceedings; 6) permit issuance on federal lands; 7) permit modifications; 8) bond release; 9) approval of state programs, etc.

adoption of a rule, against whom would fees be assessed? The phrase "shall be assessed against *either* party," in tandem with the *Ruckelshaus* holding that only parties achieving some success on the merits are eligible for an award, requires identification of a successful and an unsuccessful party. In general rulemaking proceedings, it is difficult to identify a successful party. If one can be identified, the question arises as to against whom the fees should be assessed.

Section 525(e) makes no distinction between fee awards against the government and fee awards against private parties. An interpretation of Section 525(e) authorizing assessment of fee awards against the government in non-enforcement proceedings would be tantamount to a provision providing compensation to every party participating in those administrative proceedings.[21] If this is what Congress intended, it could have so provided. On the other hand, interpreting Section 525(e) to provide for assessment of fee awards against private parties who participate in administrative proceedings may actually result in discouraging citizen participation in such proceedings. There is no doubt that a party would be reluctant to participate in a rulemaking or other informal administrative proceedings if, by so doing, it subjected itself to liability for the attorney fees of other participating parties.[22]

The plethora of interpretive problems raised by application of Section 525(e) to non-enforcement, non-adversarial proceedings is endless. In such proceedings, concepts such as "prevailing party," "either party" and "some success on the merits" are meaningless. We find it incredible that, if in enacting Section 525(e) Congress intended such a dramatic shift from prior practice and other federal fee statutes, it did not provide at least some guidance on such difficult and novel problems of statutory construction and application. We are therefore of the opinion that Section 525(e) does not provide for fee awards for work done in conjunction with non-adversarial administrative proceedings.

This conclusion is supported by the principle of strict construction that we must apply in interpreting Section 525(e). Since provisions providing for fee assessments against the federal government are waivers of sovereign immunity, they must be strictly construed in a narrow fashion, favoring the government in the case of any doubt. *Ruckelshaus*, 463 U.S. 680, 103 S.Ct. 3274, *Nichols v. Pierce*, 740 F.2d 1249, 1255–56 (D.C.Cir.1984); *Action on Smoking and Health v. CAB*, 724 F.2d 211 (D.C.Cir.1984). Attorney fees for work before an agency should not be granted without the clearest expression of statutory authorization. *Florida Power and Light Co., v. Costle*, 683 F.2d 941 (5th Cir.1982).

This clear expression of statutory authorization is not present with respect to application of Section 525(e) in non-enforcement proceedings. As indicated above, the statutory language is not consistent with an interpretation that includes non-enforcement, non-adversarial proceedings. Furthermore, neither the legislative history of the provision nor the interpretation placed on the provision by Interior manifest the requisite expression of statutory authorization to warrant an extension of Section 525(e) to non-enforcement proceedings.

**21.** Such an interpretation would run afoul of the *Ruckelshaus* requirement that a party must achieve, "some success on the merits" before it is eligible for a fee award. In rulemaking proceedings, for example, the ultimate result, rule or decision will be the one adopted by the government. Thus, an interpretation allowing fee assessments against the government would in essence be an award assessed against the decisionmaker.

Such an interpretation would also subject the government to an award of fees in a case where the government has not clearly waived its sovereign immunity. Except to the extent it has waived its immunity, the government is immune from claims for attorney's fees. *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 267–68, 95 S.Ct. 1612, 1626 (1975).

**22.** The legislative history makes clear the important role that Congress intended citizen participation to fill under SMCRA. *See e.g.,* H.Rep. No. 95–218, 95th Cong., 1st Sess. at 88–89, U.S. Code Cong & Admin.News 1977, p. 593.

Up until 1976, neither Senate nor House versions of surface mining legislation contained a provision comparable to Section 525(e). The fee provision in the Senate bill on the 1977 Surface Mining Act was limited to orders issued pursuant to Section 521 of the Act, that is, orders involving the Secretary's enforcement authority and his ability to revoke or suspend permits because the permittee was not in compliance with the Act. The 1977 version of the Senate bill did *not* contain a provision providing for fees "in any administrative proceeding." S.Rep. No. 95–128, 95th Cong. 1st Sess. at 40–41.

The fee provision which was the forerunner of Section 525(e) first appeared in the 1977 House bill, H.R. 2. When first introduced, the provision was entitled "Award of Attorney Fees to Prevailing Plaintiff in Administrative Proceedings." The concluding language read: " ... may be assessed against the person committing a violation of the Act." Representative Tsongas explained that this amendment "would grant attorneys fees to the plaintiff in administrative *judicial* hearings." (emphasis added.) Markup Session on the Surface Mining Control and Reclamation Act of 1977; Hearings on H.R. 2 before the Subcommittee on Interior and Insular Affairs, 95th Cong., 1st Sess., 295 (March 28, 1977) pp. 280–470.[23] This language demonstrates an intention to limit compensation to formal adjudicatory proceedings reviewing notices of violations, cessation orders or permit revocations and civil penalty proceedings.

In its final report, the House Committee omitted the language "person committing a violation of the Act." Representative Bauman offered an amendment which inserted in its place the phrase "may be assessed against either party as the court may deem proper." In support of his amendment, Representative Bauman stated that "the court [sic] should be able to award fees to either party as they see fit." The committee accepted the amendment. However,

there is no evidence that in so doing it intended to extend the applicability of the attorney fee provision to proceedings other than enforcement related adjudicatory proceedings. Rather, Congress intended to permit an award of fees to either party in such proceedings. Thus, the scope of Section 525(e) was, from its inception, limited to formal proceedings involving enforcement actions.

As Section 525(e) of H.R. 2 emerged from the House, it read:

Whenever an order is issued under this section, or as a result of any administrative proceeding under this Act, at the request of any person, a sum equal to the aggregate amount of all costs and expenses (including attorney fees) as determined by the Secretary to have been reasonably incurred by such person for or in connection with his participation in such proceedings, including any judicial review of agency actions, may be assessed against either party as the court may deem proper.

H.Rep. No. 95–218, 95th Cong., 1st Sess. at 46. The other provisions of Section 525 of H.R. 2 were similar to the Senate bill and were limited to matters involving the Secretary's enforcement actions.

The legislative history of H.R. 2 is devoid of any discussion regarding fees for administrative proceedings. There is no reference in the section-by-section analysis of H.R. 2 to either Section 525 in general or Section 525(e) in particular. *See* H. Rep. No. 95–218, 95th Cong., 1st Sess. at 69–70. There is merely a general discussion of the need for citizen participation under the Surface Mining Act. H.Rep. No. 95–218, 95th Cong., 1st Sess. at 88–89. Virtually the only statement on the scope of Section 525 appears in the 1977 Conference Report. It states:

Section 525. The House bill and its companion section of the Senate amendment were very similar. The House bill allows

---

**23.** Representative Tsongas also compared the language of the provision to that contained in the Freedom of Information Act, the Privacy Act, the Coal Mine Health & Safety Act and the Fair Housing Act. Mark-up Transcript at 294. None of these statutes authorizes payment of attorney fees in informal, non-adjudicatory administrative proceedings.

the Secretary to award costs in an administrative proceeding. The Senate amendment contained no similar provision. The conferees adopted a version of the House provision modified to clarify responsibility for awarding such costs.

H.Rep. No. 95–493, 95th Cong., 1st Sess. at 111, U.S.Code Cong. & Admin.News 1977, p. 743.

The context of Section 525 throughout its entire legislative history related solely to administrative review of the Secretary's enforcement actions. *See e.g.*, S.Rep. No. 94–101, 94th Cong., 1st Sess. at 57; H.Rep. no. 94–986, 94th Cong., 2d Sess. at 79. It is simply too much to believe that Congress intended by the words "or as a result of any administrative proceeding under this Act" to authorize, virtually without limit, fees and costs for participation in any kind of administrative proceeding.[24]

In addition, the legislative history of SMCRA points out that the fee provisions of the Act should be construed consistently with the Water Pollution Control Act Amendments of 1972 and the Marine Protection, Research and Sanctuaries Act of 1972. H.R.Rep. No. 218, *supra*. The legislative history under both model statutes demonstrates that Congress enacted the fee provision to encourage citizen participation in enforcement activities. S.Rep. No. 414, 92d Cong. 2d Sess., 1972 U.S. Code, Cong. & Admin. News at 3668, 3747; S. Rep. No. 451, 92d Cong., 2d Sess., 1972 U.S. Code, Cong. & Admin. News at 4234, 4249–50. Neither of the model statutes provide for fee awards in administrative proceedings.

Furthermore, the contemporaneous and long-standing construction of Section 525(e) in 1978 by former Secretary of the Interior, Cecil D. Andrus, limited the scope of Section 525(e) to proceedings related to the enforcement scheme of the Act.[25] *Chemehuevi Tribe of Indians v. FPC*, 420 U.S. 395, 409–410, 95 S.Ct. 1066, 1074–1075, 43 L.Ed.2d 279 (1975) (a longstanding, uniform construction by the agency charged with administration of a statute is entitled to great respect). Accordingly, the Secretary's interpretation limiting the scope of Section 525(e) to actions under the enforcement scheme of SMCRA is entitled to great deference and ought to be upheld. *Chevron v. NRDC*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). These principles are particularly applicable here because of the long history of surface mining legislation, its complexities and its "apparent inconsistencies." *Union Carbide Corp. v. Andrus*, 13 ERC 1481, 1482 (D.W. Va.1979).

Accordingly, when Section 525(e) is closely analyzed, it becomes apparent that Congress did not intend the radical departure from long standing principles of fee shifting urged by EDF and Sierra. It is consistent with both the statutory language and legislative history of Section 525(e) to conclude that it does not provide for fee awards in non-enforcement, non-adjudicatory, administrative proceedings.

We need not go so far, however, as to hold that Section 525(e) is inapplicable to non-enforcement administrative proceedings in order to find that EDF and Sierra are not entitled to an award from the government for the work they did in con-

---

**24.** When Congress has considered departing from the well-established rule that fees and costs are not recoverable, it has discussed the issue with a clarity that is missing from the legislative history of Section 525(e). For example, in the legislative history of the Toxic Substance Control Act, Congress addressed the issue in these terms:

"Under the rulemaking procedures of this legislation, compensation is available to pay attorney fees and other costs of representing persons before EPA."

S.Rep. No. 94–698, 94th Cong., 2d Sess. at 12; 1976 U.S.Code Cong. & Admin.News, 94th Cong., 1st Sess. at 4491, 4502.

**25.** It appears that proceedings involving the Act's enforcement scheme are also necessarily adjudicatory proceedings. 30 U.S.C. 1264; 1268(b); 1275(a)(2). Adjudicatory proceedings require an expertise that only an attorney possesses. This fact lends further support to the position that an award is authorized only for certain types of administrative proceedings.

junction with the unsuitability petition.[26] A holding that petitioners are not entitled to a fee award *from the government* is mandated by the clear language of SMCRA. Section 525(e) provides that fees may be assessed against "either *party.*" (emphasis added). According to the statutory language, therefore, it would not be proper to assess fees against the government for the administrative proceedings unless the government was a "party" to those proceedings. Because the government was not a "party" to the unsuitability designation proceedings, it cannot be liable for a fee award.

The government's role in the unsuitability designation proceedings was akin to factfinder, decisionmaker or legislator.[27] Secretary Andrus did not take an initial position. Rather, he listened to the positions of the various parties and then, based on the information presented, he issued a decision. The role of the Secretary was essentially that of a specialized legislator. It would be no more appropriate to assess fees against the United States in these circumstances than it would be to assess fees against the judge in adversarial litigation. Because Interior, the Secretary and OSM were not "parties" to the proceeding,[28] we hold that fees cannot be assessed against them based on the plain language of the statute.[29]

## IV. *Application*

Having held that Section 525(e) does not allow a fee award for work done in conjunction with the unsuitability petition proceedings, that petitioners are not entitled to an award of fees for those claims on which they were aligned with the government and that petitioners must have achieved "some success on the merits" in order to be eligible for an award, we turn to the difficult task of computing the actual amounts to which petitioners are entitled.

For purposes of determining the fee award, we will divide the litigation in this court into four phases.[30] The Pre-Remand Phase, commenced with the filing of these lawsuits and ended in July, 1981. This phase entails the proceedings in this court

---

**26.** All of the parties, in their memoranda to this court, concentrated on the broad issue of whether Section 525(e) allows fee awards in non-enforcement, non-adjudicatory administrative proceedings. As is clear from the above discussion, we agree with the government that Section 525(e) does not authorize fee awards in such proceedings. We decline to make a formal holding to that effect, however, because we prefer to base our decision on the more narrow proposition that the government was not a "party" to the administrative proceedings.

**27.** The designation proceedings were not adversarial. The regulations in effect at the time the petition was processed established "minimum procedures and standards for designating federal lands as unsuitable for ... surface coal mining...." 30 C.F.R. § 769.1 (1980). Among other things, they provide that "no party shall bear any burden of proof ...," 30 C.F.R. § 769.14(d) (1980), and that "[t]he hearing shall be legislative and fact-finding in nature, without cross-examination of witnesses." 30 C.F.R. § 796.17(a) (1980).

**28.** We hold only that petitioners are not entitled to a fee award *from the government.* Because petitioners are only seeking fees from he government, we make no holding as to whether it would be proper to assess fees against the private parties that participated in the adminis-

trative proceedings. The potential chilling affect resulting from fee assessments against private parties, however, is obvious.

**29.** Our holding that the government was not a "party" at the administrative level alleviates the need to address another issue of statutory construction present in Section 525(e). The government urges we remand these petitions to the Secretary on the ground that the authority to award costs and expenses incurred in conjunction with administrative proceedings lies with the Secretary and not with this court. Even if correct, the government's contention makes no difference here in light of our holding that because the government was not a "party," it cannot be liable for the fees petitioners incurred in conjunction with the unsuitability designation proceedings. It would be pointless to remand the petitions to the Secretary because Section 525(e) simply does not give the Secretary the authority to assess fees against the government under these circumstances.

**30.** Although petitioners also sought an award for fees and costs for the administrative phase of proceedings which led to these actions, we need not include the administrative proceedings as one of the phases in light of our holding that petitioners are not entitled to any fees at all for the work done in those proceedings.

up until the United States filed its motion to remand the designation decision to Secretary Watt. Phase II, The Remand Phase, refers to all of the proceedings involving the government's motion to remand. It includes the period from July of 1981 until January 27, 1982, the date this court denied the government's motion. Phase III, The Post-Remand Phase, runs from January 27, 1982 until June 26, 1985 when this court entered final judgment in these cases. Phase IV, The Fee Petition Phase, entails all proceedings subsequent to the entry of final judgment. This phase consists of petitioner's efforts to recover fees for their participation in the other three phases and in the administrative proceedings.

## A. *The Requisite Degree of Success*

The threshold question is whether petitioners achieved the requisite degree of success on the merits in order to be eligible for an award under the *Ruckelshaus* standard. This court has watched this litigation develop, has witnessed the involvement of the various parties and the settlement that was ultimately reached. As a result, we feel confident in finding that the defendants achieved some success on the merits of their claims. They are therefore *eligible* for an award under the *Ruckelshaus* standard.

That a party is *eligible* for an award, however, does not mandate that such party is *entitled* to that award. Specifically, success on the merits of some claims does not necessarily entitle a petitioner to an award for the time spent on all claims in the litigation. The Supreme Court elaborated on this point in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). *Hensley* involved a petition for

fees under 42 U.S.C. § 1988 which provides that, in federal civil rights actions, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." The Supreme Court took the opportunity to clarify the proper relationship of the results obtained to an award of attorney's fees. It noted:

> That the plaintiff is a "prevailing party" ... may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved.

> \* \* \* \* \* \*

> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

*Id.* at 436–37, 103 S.Ct. at 1941.

One of the considerations identified by the Court was that, in cases where a plaintiff succeeds on only some of his claims for relief, fees should not be awarded for work on unsuccessful claims which are unrelated to the successful ones. *Id.*, at 435, 103 S.Ct. at 1940.[31] This leaves us with the difficult task of determining which of petitioners claims were sufficiently related to their successful claims to warrant an award for the time spent on them.[32]

Both Sierra and EDF were successful in their capacity as defendants. However, any success claimed in relation to their affirmative claims is dubious. In *Utah In-*

---

**31.** With regard to the burden of designating how particular time was expended, the Court noted.

> We recognize that there is no certain method of determining when claims are "related" or "unrelated." Plaintiff's counsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures.

*Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12.

**32.** The difficulty of this task is apparent from recognition of the fact that parties often pursue claims in the alternative or make claims with the intention that they will later be sacrificed or used as bargaining chips.

*ternational, Inc. and Nevada Electric v. Department of the Interior, et al.*, both EDF and Sierra were named defendants. In that action, UII sought a judgment declaring the unsuitability designation void. EDF and Sierra brought counterclaims and cross-claims against the United States. The ultimate result was a settlement agreement in which all of the parties dismissed most of their claims.[33] Under the terms of the settlement, the status quo was essentially maintained—the areas covered by the unsuitability designation, but no others, are off-limits to strip mining. EDF and Sierra were therefore successful in their role as defendants, in that they successfully maintained the existing unsuitability designation. They were not successful in their

cross-claims and counterclaims in that those claims were all dismissed. We therefore hold it would not be proper to award them fees for their efforts on those claims.[34]

B. *The Remand Proceedings*

After a careful examination of the proceedings in this court, we conclude that, with the exception of this motion, only in Phase III, the Remand Phase, were the petitioners both successful as defendants *and* not aligned with the government. As defined above, Phase III of the litigation involved the United States' motion to remand the Andrus' decision to Secretary Watt for reconsideration. UII and Nevada Electric supported the government's mo-

**33.** The exception to this was EDF's hydrology claim which was later resolved through stipulation. The stipulation of dismissal provided:

1. The Secretary, in the consideration of a permit application for lands located in the Petition area, shall not approve a permit unless the applicant can demonstrate that the proposed surface coal mining operation has been designed to prevent material damage to the hydrologic balance outside the permit area, *as per section 510(b)(3) of SMCRA and the rules and regulations promulgated pursuant thereto.*
2. The Secretary shall not approve a permit for lands located in the Petition area unless the applicant can demonstrate, *in accordance with section 510(b)(5) of SMCRA and the rules and regulations promulgated prusuant [sic] thereto,* that the proposed surface coal mining operation will not materially damage the quantity and quality of water in surface and underground water systems that supply farming activities on alluvial valley floors.
3. In addition, the Secretary shall not issue a permit unless the applicant can demonstrate, *in accordance with section 510(b)(2) of SMCRA and the rules and regulations promulgated pursuant thereto,* that reclamation of land located in the Petition areas that are affected by the proposed surface coal mining operation can be accomplished under the reclamation plan.

(Emphasis added.) The Stipulation of Dismissal further stated that "[n]othing herein shall be construed as imposing a duty not authorized by law."

EDF claims that the settlement of the hydrology claim was favorable to it and that it is therefore entitled to an award for work done on that claim. We reject EDF's contention. The stipulated agreement which merely provides that the Secretary comply with the existing provisions of

SMCRA and the accompanying rules and regulations does not constitute a successful settlement for EDF when viewed in light of EDF's original hydrologic claims. EDF claimed that the Secretary had been arbitrary and capricious in rejecting EDF's hydrology claims as the basis for an unsuitability designation. That EDF failed in pressing this claim is evidenced by the fact that the original unsuitability designation still stands. None of the terms of the Stipulation of Dismissal go beyond the terms of the Secretary's unsuitability designation decision of the language of SMCRA. We fail to see how a stipulation requiring the Secretary to do what he was already obligated to do constitutes the type of "success on the merits" required under *Ruckelshaus.* The Secretary, however, was already required to enforce the law. We therefore decline a fee award for the time EDF spent prosecuting its hydrology claim.

**34.** Under *Ruckelshaus,* a party need only achieve *some* success on the merits to be eligible for an award of fees. However, under the standard set out in *Hensley,* 461 U.S. 424, 103 S.Ct. 1933, fees should not be awarded for work done on EDF's and Sierra's unsuccessful claims unless the petitioners demonstrate they are sufficiently related to their role as defendants. Petitioners have not made such a demonstration in these cases.

The parties have also focused much attention on the issue of whether the petitioners achieved the requisite degree of success in the administrative proceedings culminating in Secretary Andrus' unsuitability designation. We need not resolve this issue because of our holding that the government was not a "party" to the administrative proceedings and therefore, under Section 525(e), fees may not be assessed against it. *See* section III, *infra.*

tion. Only petitioners opposed it. Because EDF and Sierra were not aligned with the government on the remand issue, because they were successful as to the government on the issue and because the position taken on the remand motion was in line with petitioners' role as defendants, we find that petitioners are entitled to an award of fees for their work in the Remand Phase.

The United States objects to an award for the remand phase of the proceedings on the ground that the remand motion was purely *procedural* and that under *Ruckelshaus,* a party must achieve some degree of success on the *merits* before it is eligible for an award.

We agree that, absent success on the merits, a party is not entitled to an award of fees for purely procedural victories. *Hanrahan v. Hampton,* 446 U.S. 754, 757–59, 100 S.Ct. 1987, 1989–90, 64 L.Ed.2d 670 (1980). However, this is not a case where petitioners failed on the merits. Rather, this is a case where petitioners did achieve some success on the merits.[35] Because, in the opinion of this court, their success on the remand motion was integral to that success, petitioners are entitled to an award for their efforts on that motion. It is often the case that one or more procedural victories are behind a substantive victory. A party entitled to an award for the substantive victory is certainly entitled to an award for the procedural victories which contributed to the ultimate success.

### C. *The Lodestar*

Our next task is to determine the amount of the fee to which petitioners are entitled for their work on the remand motion. "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended ... multiplied by a reasonable hourly rate. This calculation provides an objective basis

on which to make an estimate of the value of a lawyer's services." *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. The product of this multiplication is known as the "lodestar." There is a strong presumption that the lodestar represents the reasonable fee to which counsel is entitled. *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Certain adjustments, either upward or downward can be made to the lodestar if such adjustments are supported by specific evidence and justified by the party seeking the adjustment. *Pennsylvania v. Delaware Valley Citizens' Council,* —— U.S. ——, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986).

Petitioners in this case contend that the lodestar should be enhanced to account for several factors. These include enhancement on account of the novel and difficult issues involved in these cases and the commensurate degree of skill required by petitioners' counsel. EDF also argues that any award should be enhanced by 25% to compensate for the contingent nature of the award—i.e., the risk that EDF would not recover at all. Sierra argues that any award should be increased by 33% to compensate for the award's contingent nature. Both petitioners assert that the fee awards should be calculated at current market rates to compensate for the delay in receiving them.

### 1) *Difficulty of the case:*

We decline to enhance the award beyond the lodestar figure based on the difficulty of the issues involved or the skill of counsel. The difficulty of the issues involved in this litigation will be reflected in the number of hours expended by counsel on those issues. Thus, any enhancement of the lodestar on this basis would actually be double-counting. *Delaware Valley,* 106 S.Ct. at 3098. We similarly decline to en-

---

**35.** Because petitioners were successful in their role as defendants, they may have been entitled to an award for all of the work done in connection with that role had they sought the award from the proper parties, e.g., UII and Nevada Electric. We isolate the Remand Phase here solely because it is the only phase of the pro-

ceedings during which the petitioners were not aligned with the government and were successful as against the government. Thus, while eligible for an award for all of the work done as defendants, petitioners are only entitled to an award from the government for the time spent in conjunction with the remand motion.

hance the award based on the high degree of skill required by counsel in that such skill would be represented in counsel's hourly billing rate. *Id.*

### 2) *Contingent Nature of the Award:*

■ The question of enhancement based on the contingent nature of the award presents a close issue. Just last term, that question confronted the Supreme Court. However, the Court did not decide it. It stated:

> There remains the question of upward adjustment, by way of multipliers or enhancement of the lodestar, based on the likelihood of success, or to put it another way, the risk of loss. This is the question that we left open in *Blum* and on which the Courts of Appeals are not entirely in accord. We are of the view that our resolution of the issue would be benefitted by reargument and hence we do not decide it now. Accordingly, an order will issue restoring the case to the argument docket insofar as it raises the question whether attorney's fee chargeable to a losing defendant under the Clean Water Act *and the comparable statutes* may be enhanced based on the risk of loss, and if so to what extent. (emphasis added.)

*Delaware Valley,* 106 S.Ct. at 3100.

Thoughtful reflection on this question leads us to conclude that enhancement of the lodestar to account for the contingent nature of an award would not be proper in this case.[36] In *Palmer v. Shultz,* 594 F.Supp. 433, 438 (D.D.C.1984), the court stated that "recent decisions by the Supreme Court and the Court of Appeals ... cast doubt on the continuing validity of the contingency adjustment."[37] Adjustment of the attorney's fees to compensate for the risk of nonpayment if the party should lose on the merits is inconsistent with

SMCRA's mandate, as interpreted in light of *Ruckelshaus v. Sierra Club, supra,* that only a *prevailing* party may be awarded reasonable attorney's fees. That statutory requirement was strictly construed by the Supreme Court in *Hensley,* where the Court excluded legal services rendered in connection with unsuccessful claims from the calculation of attorney's fees awarded to a plaintiff who prevailed on certain other claims brought in the same action. The Court stated:

> The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separated lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.... Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill.

Awarding an upward adjustment to the lodestar for the risk of losing and the concomitant risk of not obtaining an award of attorney's fees is not unlike compensating an attorney for unsuccessful claims; it hedges the statute's requirement that only prevailing parties may recover attorney's fees.

### 3) *Compensation for Delay:*

■ Petitioners assert that we should use current market rates in computing the award in order to compensate for inflation and delay. They contend that using current rates is at least as simple as the alternative of reconstructing historical rates and adding a percentage for inflation and interest. There may be merit to petitioner's argument except for the fact that petitioners are not entitled to any interest on a fee award.

---

36. The Tenth Circuit has indicated that the contingency factor as a basis for enhancement of fee awards under the Civil Rights Act must be viewed with caution. *Ramos v. Lamm,* 713 F.2d 546, 558 (10th Cir.1983).

37. Other courts have reached the same conclusion. In *Jones v. Central Soya Co., Inc.,* 748 F.2d 586 (11th Cir.1984), the Court of Appeals held that a risk premium may be allowed only if the attorney agreed to hold his client unaccountable for fees if he lost the case. *Id.* at 593.

830

Earlier this year, the Supreme Court addressed the issue of interest awards against the government in connection with a federal attorney's fee provision. In *Library of Congress v. Shaw*, —— U.S. ——, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) the Court passed on whether interest was properly included as part of attorney's fees awarded pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. The Court concluded that interest was not properly part of the award.

The doctrine of sovereign immunity mandates that "federal statutes cannot be read to permit interest to run on a recovery against the United States unless Congress affirmatively mandates the result." *Id*. at 2962. "The [congressional] consent necessary to waive the traditional immunity must be express, and it must be strictly construed." *Id*. at 2963 *quoting United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 659, 67 S.Ct. 601, 91 L.Ed. 577 (1947).

Because of sovereign immunity, the Court refused to read a waiver of interest awards into such phrases as "a reasonable fee." The Court similarly rejected an argument that the no-interest rule did not prohibit an award of "compensation for delay." The Court declined to avoid the no-interest rule by devising a new name for an old institution. It reasoned that "[i]nterest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money." *Id*. at 2965. Because compensation for delay is the equivalent of interest, the Court concluded that such compensation could not be awarded unless specifically mandated by Congress.

We hold *Shaw* is controlling in this case with regard to the issue of whether an award should be based on current or histor-ical rates. Petitioners contend that current rates, rather than historical rates should be used as a means of compensating them for delay or as a shortcut for computing interest. Section 525(e), however, does not waive the government's sovereign immunity with regard to interest awards. Absent such a waiver interest is not awardable against the government. We therefore must compute EDF's and Sierra's awards on the basis of historical rates.

In order for this court to compute a proper award, we must ascertain the reasonable hourly rates that similarly qualified legal counsel would have charged during late 1981, the year in which the government brought the remand motion.[38] Neither EDF nor Sierra has submitted affidavits regarding the historical hourly rates of counsel who worked on the Remand Phase. Therefore, petitioners have 30 days in which to file supplemental affidavits identifying the applicable historical hourly billing rate. The affidavits should address nothing else—the court is only concerned with the hourly rate to which counsel was entitled in 1981. The government will then have 30 days following service of petitioners' supplemental affidavits in order to file any counter-affidavits.[39]

### D. *Computation*

The appropriate award in these cases will be determined by taking the aggregate number of hours expended by counsel on the remand motion and multiplying that figure by the historical hourly billing rate as determined by the supplemental affidavits.

EDF has not isolated the number of hours expended on the remand motion. The Appendix to this opinion is a listing of all the hours the court could identify as having been spent on the Remand Phase.[40]

---

**38.** We note that we are interested in the 1981 billing rates in Salt Lake City, Utah, the community in which the judicial proceedings were located.

**39.** We stress that the court is interested only in the 1981 hourly billing rates as documented by the affidavits. No memoranda will be allowed.

Neither will oral argument be allowed. The court will consider the issue to be submitted on the basis of the affidavits alone.

**40.** The Appendix includes listings of claimed hours only for the period of time falling in the Remand Phase and only for counsel that worked on the Remand Phase.

Where counsel listed a block of time and indicated work on both the Remand Phase and other phases of the litigation, the court has done its best to estimate the amount of time spent on the remand motion. The amount of time allowed by the court is indicated in the appendix under the "Hours Allowed" column.[41]

The total number of compensable hours listed in the Appendix for EDF's various counsel are as follows: [42]

| Attorney | Hours |
| --- | --- |
| David Mastbaum | 115.20 |
| William J. Lockhart | 68.50 |
| Wayne McCormack | 27.50 |
| Thomas J. Graff | 20.00 |
| Total | 231.20 |

This total multiplied by historical hourly rates as determined from the supplemental affidavits will yield the fee award to which EDF is entitled for the Remand Phase. EDF has documented a list of expenses incurred in these proceedings but has not isolated any of them to the Remand Proceedings. We are therefore unable to award EDF anything in the way of expenses.

Sierra has isolated the number of hours it expended on the remand motion. The totals for Sierra are as follows:

| Attorney | Hours |
| --- | --- |
| William S. Curtiss | 63.3 |
| Wayne C. Petty | 4.0 |
| Total | 67.3 |

This total multiplied by the historical hourly rates as determined by the supplemental affidavits will yield the award to which Sierra is entitled. In addition, Sierra is entitled to expenses of $180.23 which it has documented were expended in connection with the remand motion.

### E. *Phase IV: The Fee Applications*

■ The one other phase of these proceedings in which petitioners are entitled to an award is in the time expended on Phase V. This is the time expended in conjunction with the motions which are the subject of this opinion—the motions for fees and costs.

The courts have made it clear that hours reasonably spent in establishing an entitlement to fees are compensable. *Hernandez v. George,* 793 F.2d 264, 269 (10th Cir.1986). Where petitioners, however, are successful in recovering only a fraction of the fee award originally sought, we do not believe they are entitled to an award for all of the time spent prosecuting the fee petition. Any award for time spent in pursuing motions for fees must not be excessive in relation to the award obtained. Only time spent seeking fees which were actually awarded is compensable.

Because it is impossible to correlate the time spent on a particular aspect of the fee application with the corresponding phase of the litigation, we must do our best to otherwise make sure that petitioners are compensated fairly for their work in pursuing the motion for fees. We therefore will calculate petitioners' fee awards for Phase IV by allowing them the percentage of their Phase IV request that correlates with the percentage of the total fee request ultimately awarded on the other phases.

We have determined that petitioner EDF may recover fees for a total of 231.20 hours which constitutes 10.26% of the hours claimed in its motion.[43] We conclude

---

**41.** The burden is on petitioners to document the amount of time spent on each particular aspect of the litigation. *See* note 31, *supra. See also, Ramos v. Lamm,* 713 F.2d 546, 553 (10th Cir. 1983). EDF failed to do this. We therefore were forced to disallow hours when it was unclear whether they were spent on the compensable phase of the litigation—i.e., the Remand Phase. We have also disallowed hours spent on the public relations aspect of the case, i.e., time spent by counsel communicating with the press and other news media. We believe EDF should have exercised sufficient discretion in its fee request to have eliminated claims for fees incurred as part of its public relations efforts. *See Ramos,* 713 F.2d at 553.

**42.** According to the declarations submitted with EDF's motion, only the four attorneys listed spent any time on the remand proceedings.

**43.** EDF sought compensation for 2,252.70 hours exclusive of the hours it claimed on Phase IV, The Fee Petition Phase. It claimed an additional 526 hours on Phase IV.

that EDF is thus entitled to compensation for 10.26% of the hours it claimed in conjunction with its fee application. This results in an award on Phase IV of $5,300.82.[44]

We have awarded petitioner Sierra fees for 67.3 hours. This constitutes 6.15% of the hours claimed in its motion for fees.[45] We therefore conclude that Sierra is entitled to an award for Phase IV of $1,656.25 plus the $398.00 in expenses it has documented for Phase IV.[46] This results in a total Phase IV award of $2,054.25.

## V. *The Equal Access to Justice Act*

■ The petitioners also moved for an award of fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, in the event they do not receive an award under Section 525(e) of SMCRA. Both EDF and Sierra, however, have limited their claims under the EAJA to those fees and expenses incurred in connection with the government's motion to remand.

The relevant portion of the EAJA provides:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust. (emphasis added.)

28 U.S.C. § 2412(d)(1)(A).

The EAJA, however, only applies in cases where fees are not already authorized by statute. *See Environmental Defense Fund v. Environmental Protection Agency*, 716 F.2d 915, 919 (D.C.Cir.1983). Because petitioners have successfully recovered fees incurred in the remand proceedings from the government pursuant to Section 525(e) of SMCRA, they are not entitled to fees incurred in conjunction with the remand proceedings under the EAJA.

Accordingly,

IT IS HEREBY ORDERED that the motion of EDF for an award of fees and costs is granted in part. EDF is hereby awarded fees and costs to be assessed against the United States for Phase IV of these proceedings in the amount of $5,300.82.

IT IS FURTHER ORDERED that EDF is entitled to a fee award for Phase II of 231.20 hours multiplied by the hourly rate to be determined on the basis of supplemental affidavits.

IT IS FURTHER ORDERED that EDF has 30 days from the date of this opinion to file such supplemental affidavits.

IT IS FURTHER ORDERED that the motion of Sierra for an award of fees and costs is granted in part. Sierra is hereby awarded fees and costs to be assessed against the United States in the amount of $2,054.25 for Phase IV of these proceedings.

IT IS FURTHER ORDERED that Sierra is entitled to a fee award for Phase II of 67.3 hours multiplied by the hourly rate to be determined on the basis of supplemental affidavits.

IT IS FURTHER ORDERED that Sierra has 30 days from the date of this opinion to file such supplemental affidavits.

44. Because any fees incurred in conjunction with Phase IV were incurred shortly before or simultaneously with submission of the declarations establishing current market rates, we have calculated the award for Phase IV on those current market rates. EDF sought a total of $51,665.00 on Phase IV. Our award of $5,300.82 for Phase IV represents 10.26% of that figure.

45. Sierra sought compensation for 1093.80 hours exclusive of the hours it claimed on its fee petition. It claimed an additional 215.5 hours on Phase IV, The Attorney Fee Phase.

46. We have used current market rates in calculating the award for Phase IV. *See* note 44, *supra.* In Sierra's case, we have used $125.00 as the hourly billing rate for Mr. William Curtiss, the attorney who prepared and argued Sierra's motion for fees. This rate multiplied by 6.15% of the 215.5 hours claimed on Phase IV yields the award for Phase IV of $1,656.25.

IT IS FURTHER ORDERED that the United States has 30 days from the filing of any affidavits by EDF and Sierra to file opposing affidavits.

## APPENDIX

A. EDF: David Mastbaum: Remand Proceedings

| Date | Hours Claimed | Hours Allowed | Description |
|---|---|---|---|
| 7/6/81 | 5.3 | 3.0 | Telephone conversations with T. Graff, J. Brown, W. McCormack and W. Curtiss. Research on authority of Secretary of the Interior to "reconsider" the Andrus decision. |
| 7/7/81 | 4.0 | 2.0 | Legal research on reconsideration and unsuitability provisions of Surface Mining Act. Draft pleadings to intervene in State of Utah's action and consolidation. |
| 7/8/81 | 2.9 | 2.9 | Legal research on reconsideration and scope of judicial review. |
| 7/9/81 | 2.9 | 2.9 | Legal research on reconsideration and scope of judicial review. |
| 7/10/81 | 3.2 | 0.0 | Telephone conversation with E. Rosenberg, U.S. Justice Dept., A. Stirba, State of Utah. R. Van Buskirk, Pillsbury, Madison and Sutro, and W. Curtiss regarding intervention and consolidation and legal research on legislative history on Sections 522, 526 of Surface Mining Act. |
| 7/13/81 | 4.1 | 0.0 | Preparation of final drafts of intervention and consolidation pleadings and memoranda to Berkeley office and Stewart and Madden regarding status of litigation. |
| 7/14/81 | 1.0 | 0.0 | Telephone conversations with W. McCormack, M. Grasser, National Park Service and E. Rosenberg, U.S. Justice Dept., regarding litigation. |
| 7/15/81 | 4.8 | 0.0 | Legal research on reconsideration and Surface Mining Act. |
| 7/16/81 | 2.6 | 0.0 | Legal research on Surface Mining Act. |
| 7/20/81 | 4.3 | 0.0 | Telephone conversations with all parties and W. McCormack concerning government's request for enlargement of time to answer. Legal research on Surface Mining Act. |
| 7/22/81 | 2.4 | 0.0 | Telephone conversations with M. Grasser, National Park Service and W. Curtiss. Legal research on extent of judicial review. |
| 7/27/81 | 2.4 | 0.0 | Telephone conversations with T. Graff, A. Stirba, State of Utah, R. Van Buskirk, Pillsbury, Madison and Sutro. Meeting with Luecke and Yuhnke regarding EDF's position on proposed Utah land exchange and relationship to Alton litigation. Legal research on Surface Mining Act. |
| 7/29/81 | 3.0 | 0.0 | Telephone conversations with W. McCormack, P. Wondra, National Park Service, T. Graff. Meeting with D. Luecke. Legal research on Surface Mining Act. |
| 8/3/81 | 0.7 | 0.0 | Telephone conversations with M. Grasser of National Park Service and W. Curtiss regarding Alton litigation. |
| 8/4/81 | 0.5 | 0.0 | Telephone conversations with T. Graff and J. Tripp regarding Alton litigation and trip to Washington, D.C. |
| 8/10/81 | 3.2 | 0.0 | Review State of Utah's and UII's motions and memoranda concerning EDF's motions to consolidate and intervene. Telephone conversations with T. Graff, W. Curtiss, A. Stirba, Office of Utah Attorney Gen., and E. Rosenberg, U.S. Justice Dept. |
| 8/11/81 | 1.8 | 0.0 | Telephone conversations with R. Van Buskirk of Pillsbury, Madison and Sutro, and A. Stirba, Office of Utah Atty. Gen., and research regarding State of Utah's and UII's motions concerning EDF's motions to intervene and consolidate. |
| 8/14/81 | 0.6 | 0.0 | Telephone conversations with P. Wondra, National Park Service, and E. Rosenberg, U.S. Justice Dept., concerning meeting in Washington, D.C. with Interior personnel. |
| 8/18/81 | 0.7 | 0.0 | Telephone conversations with W. Lockhart, T. Graff and J. Foch of Penn. State University. |
| 8/20/81 | 2.3 | 0.0 | Legal research and telephone conversations with M. Grasser and B. West of National Park Service. |
| 8/25/81 | 1.6 | 0.0 | Telephone conversations with P. Wells, T. Graff and E. Rosenberg, U.S. Dept. of Justice. |
| 8/26/81 | 4.2 | 0.0 | Preparation for trip to Washington, D.C.; meeting with OSM personnel and |

| Date | Hours Claimed | Hours Allowed | Description |
|---|---|---|---|
|  |  |  | telephone conversations with W. McCormack and T. Graff. |
| 8/27/81 | 0.6 | 0.0 | Telephone conversations with Congressional staff personnel and J. Tripp regarding trip to D.C. |
| 8/28/81 | 0.7 | 0.0 | Telephone conversations with W. Lockhart, W. McCormack, P. Wondra at National Park Service. |
| 8/29/81 | 1.5 | 0.0 | Preparation of documents for Washington, D.C. trip. |
| 8/30/81–9/4/81 | 25.00 | 0.0 | Washington, D.C. trip: meetings with Interior personnel, Justice Dept. officials, media, and Congressional staffs regarding Alton litigation. |
| 9/8/81 | 0.4 | 0.0 | Telephone conversations with T. Graff and M. Grasser, National Park Service. |
| 9/14/81 | 3.0 | 3.0 | Legal research on authority of Secretary of the Interior to reconsider Alton decision. |
| 9/15/81 | 2.5 | 2.5 | Continue legal research on authority of Secretary of the Interior. |
| 9/17/81 | 1.5 | 1.5 | Continue legal research on authority of Secretary of the Interior. |
| 9/18/81 | 2.0 | 2.0 | Continue legal research on authority of Secretary of the Interior. |
| 9/20/81 | 0.5 | 0.0 | Telephone conversation with National Park Service and OSM personnel. |
| 9/21/81 | 8.0 | 0.0 | Telephone conversations with numerous individuals and media concerning Watt's announcement regarding Alton. |
| 9/22/81 | 6.3 | 0.0 | Telephone conversations with media and others regarding Watt's announcement; preparation of material for Congressional investigation. |
| 9/23/81 | 1.0 | 0.0 | Telephone conversation with National Park Service and OSM personnel regarding Alton. |
| 9/24/81 | 3.0 | 0.0 | Telephone conversations with media concerning editorials on Alton decision. |
| 9/28/81 | 3.1 | 0.0 | Telephone conversations with L. Brown (Moffat's staff) and J. Tripp; preparation of materials for Moffat. |
| 9/29/81 | 1.5 | 0.0 | Legal research. |
| 10/4/81 | 1.2 | 0.0 | Telephone conversation with W. McCormack; review legislative history of Surface Mining Act. |
| 10/6/81 | 4.0 | 0.0 | Telephone conversations with N. Watson, NPS, and OSM personnel; legal research. |
| 10/7/81 | 6.0 | 0.0 | Legal research. |
| 10/8/81 | 3.0 | 0.0 | Meeting in Denver with W. McCormack; legal research. |
| 10/10/81 | 2.0 | 0.0 | Meeting in Denver with W. McCormack and M.A. Grasser of NPS. |
| 10/13/81 | 6.3 | 6.3 | Legal research and preparation of remand memo. |
| 10/14/81 | 4.4 | 4.4 | Legal research and preparation of remand memo. |
| 10/15/81 | 8.5 | 8.5 | Legal research and preparation of remand memo. |
| 10/16/81 | 6.0 | 6.0 | Legal research and preparation of remand memo. |
| 10/19/81 | 3.5 | 3.5 | Legal research and preparation of remand memo. |
| 10/20/81 | 8.5 | 8.5 | Legal research and preparation of remand memo. |
| 10/21/81 | 6.3 | 6.3 | Legal research and preparation of remand memo. |
| 10/22/81 | 6.5 | 6.5 | Legal research and preparation of remand memo. |
| 10/23/81 | 3.0 | 3.0 | Legal research and preparation of remand memo. |
| 10/24/81 | 10.6 | 10.6 | Travel to Salt Lake City and preparation of remand memo. |
| 10/25/81 | 9.0 | 9.0 | Legal research and preparation of remand memo. |
| 10/26/81 | 8.5 | 8.5 | Legal research and preparation of remand memo. |
| 10/27/81 | 11.0 | 11.0 | Legal research and preparation of remand memo. |
| 10/28/81 | 3.5 | 3.5 | Filing of remand memo and travel to Denver. |
| 10/29/81 | 3.5 | 3.5 | Distribution of memo; telephone conversation with T. Graff and meeting at OSM. |
| 11/2/81 | 1.0 | 1.0 | Telephone conversations with W. Lockhart and counsel for the federal defendants. |
| 11/13/81 | 0.4 | 0.4 | Telephone conversations with counsel for federal defendants. |
| 11/25/81 | 0.8 | 0.8 | Telephone conversation with W. Lockhart and review federal defendants' response to EDF memo. |
| 11/30/81 | 0.6 | 0.6 | Telephone conversation with W. Lockhart; call from D. Jones; review UII supplemental memo. |
| 12/9/81 | 2.5 | 2.5 | Meeting with D. Luecke; preparation of EDF supplemental remand memo. |
| 12/29/81 | 0.5 | 0.0 | Return call to Coal Week regarding Alton. |
| 12/30/81 | 0.5 | 0.0 | Return call to D. Grueneich of Cal. Energy Commission regarding status of Alton litigation. |
| 1/4/82 | 2.0 | 2.0 | Research and writing of EDF supplemental memo on remand. Telephone conversation with W. Lockhart. |

## A. [redacted]

| Date | Hours Claimed | Hours Allowed | Description |
|---|---|---|---|
| 1/5/82 | 3.0 | 3.0 | Research and writing of EDF supplemental memo on remand. Telephone conversations with T. Graff and Lester Brown. |
| 1/8/82 | 0.5 | 0.5 | Telephone conversations with W. Lockhart, Keith Kirk (OSM), and Sandy Graham (*Rocky Mountain News.*) |
| 1/10/82 | 0.3 | 0.3 | Telephone conversation with W. Lockhart. |
| 1/11/82 | 1.1 | 0.0 | Telephone conversation with M. Grasser (NPS) and meeting with K. Kirk. |
| 1/12/82 | 0.8 | 0.8 | Telephone conversations with T. Graff, W. Lockhart, M. Shilling (OSM), K. Kirk, L. Brown. |
| 1/15/82 | 5.0 | 5.0 | Preparation for oral argument and travel to Salt Lake City. |
| 1/16/82 | 6.0 | 6.0 | Preparation for oral argument. |
| 1/17/82 | 3.0 | 3.0 | Preparation for oral argument. |
| 1/18/82 | 8.0 | 8.0 | Oral argument and travel to Denver. |
| | | 115.20 | |

## B. EDF: William J. Lockhart: Remand Proceedings

| Date | Hours Claimed | Hours Allowed | Description |
|---|---|---|---|
| 9/18/81 | 0.25 | 0.25 | TC with David Mastbaum, co-counsel, re anticipated motion by U.S. to remand Secretary Andrus' decision for reconsideration. |
| 10/6/81 | 1.0 | 1.0 | Preparation of EDF motion for extension of time to respond to U.S. motion to remand. |
| 10/13/81 | 0.25 | 0.25 | TC with David Mastbaum re extension of time. |
| 10/30/81 | 3.0 | 3.0 | Review of memoranda submitted by Sierra Club and by UII on remand issues. |
| 10/2–10/3 10/9–10/11 10/26–10/28 | 24.0 | 24.0 | Research and preparation of EDF memorandum opposing remand. |
| 11/2/81 | 0.5 | 0.5 | TC with David Mastbaum re remand issues. |
| 11/23/81 | 0.25 | 0.25 | TC with David Mastbaum re remand issues. |
| 11/30/81 | 0.25 | 0.25 | TC with David Mastbaum re remand issues. |
| 1/4/82 | 0.25 | 0.25 | TC with David Mastbaum re EDF supplemental memorandum on remand issues and preparation for oral argument. |
| 1/8/82 | 0.25 | 0.25 | TC with David Mastbaum re EDF supplemental memorandum on remand issues and preparation for oral argument. |

## B. EDF: William J. Lockhart: Remand Proceedings

| Date | Hours Claimed | Hours Allowed | Description |
|---|---|---|---|
| 1/10/82 | 0.25 | 0.25 | TC with David Mastbaum re EDF supplemental memorandum on remand issues and preparation for oral argument. |
| 1/12/82 | 0.25 | 0.25 | TC with David Mastbaum re EDF supplemental memorandum on remand issues and preparation for oral argument. |
| 1/11/82– 1/13/82 | 12.0 | 12.0 | Research and preparation of EDF supplemental memorandum opposing remand for reconsideration. |
| 1/15/82– 1/18/82 | 24.0 | 24.0 | Research, review of UII reply to EDF memos opposing remand and review of other pleadings, preparation for oral argument. |
| 1/18/82 | 2.0 | 2.0 | Oral argument to Judge Winder on U.S. motion to remand for reconsideration. |
| | | 68.50 | |

## C. EDF: Wayne McCormack: Remand Proceedings

| Date | Hours Claimed | Hours Allowed | Description |
|---|---|---|---|
| 7/6/81 | 0.5 | 0.5 | TC with David Mastbaum. |
| 8/20/81– 8/21/81 | 10.0 | 10.0 | Research finality of administrative decisions. |
| 8/26/81 | 0.25 | 0.0 | TC with David Mastbaum. |
| 8/28/81 | 0.25 | 0.0 | TC with David Mastbaum. |
| 8/29/81 | 4.0 | 4.0 | Research need for reasons in rulemaking. |
| 9/27/81 | 0.25 | 0.0 | TC with Carolyn Driscoll re extension to 10/27 |
| 9/21/81 | 0.5 | 0.5 | TC with David Mastbaum. |
| 10/2/81 | 0.25 | 0.0 | TC with John Grenfell, Pillsbury |
| 10/4/81 | 0.75 | 0.0 | TC with John Grenfell, Pillsbury |
| 10/8/81 | 1.5 | 0.0 | Meeting with David Mastbaum |
| 10/24/81– 10/28/81 | 10.0 | 10.0 | Finalize remand memo |
| 1/15/82– 1/17/82 | 4.5 | 4.5 | Prepare oral argument |
| 1/18/82 | 2.0 | 2.0 | Argument at hearing. |
| | | 27.50 | |

## D. EDF: Thomas J. Graff: Remand Proceedings

| Date | Hours Claimed | Hours Allowed | Description |
|---|---|---|---|
| 9/81–1/82 | 20.0 | 20.0 | Conversations with D. Mastbaum, and others re remand motion; review materials and Mastbaum memos on remand. |
| | | 20.0 | |